IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HOWARD COHEN, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | NO.  10-00514 |
| | : | |
| CHLN, INC. and MARK HINDS, | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM**

BUCKWALTER, S. J.                                                                                                         July 13, 2011

Presently before the Court is the Motion for Summary Judgment by Defendants CHLN, Inc. and Mark Hinds.  For the following reasons, the Motion is denied.

**I.      FACTUAL AND PROCEDURAL BACKGROUND**[1]

This action concerns the alleged discriminatory termination of Plaintiff Howard Cohen, former general manager of the Philadelphia Chart House restaurant, on the basis of his disability. Plaintiff Cohen was initially hired by Landry's Restaurants, Inc. ("Landry's") in 1998.  (Pl.'s Resp. Opp'n, Ex. A, Dep. of Howard Cohen, 13:14-25, Oct. 27, 2010 ("Cohen Dep.").)  He managed a number of the entity's restaurants between 1998 and 2006, at which time he left for a year to manage a new restaurant.  (Id. at 13:19, 19:21).  Plaintiff returned to Landry's in 2007 upon the invitation of his former supervisor, Director of Operations Charles Mayer.  (Id. at

---

[1] The statement of facts is compiled from a review of the parties' briefs and the evidence submitted in conjunction with those briefs, taken in the light most favorable to Plaintiff.

20:16-18.)

Following his return to Landry's on July 30, 2007, Plaintiff was asked to spend six months training a new management team at Charlie's Crab House in Grand Rapids, Michigan. (Id. at 22:3-23, 24:5-8.) On December 28, 2007, Plaintiff was issued a Disciplinary Action Report and suspended for one week without pay. (Decl. of Mark Hinds ¶ 7, Mar. 14, 2011 ("Hinds Decl.").) The Report cited "Unprofessional Behavior" as the reason for the suspension, and stated that Plaintiff had "made some unprofessional comments to some employees and did not act in the best interest of his staff as a leader." (Id., Ex. A.) Plaintiff denies these allegations, but acknowledges the suspension. (Cohen Dep. 34:18-20.) He was then transferred to the Philadelphia Chart House, another Landry's-owned restaurant, one month before his assignment in Grand Rapids was scheduled to end. (Id. at 32:19-22.)

On July 13, 2008, Defendant Mark Hinds, Regional Vice-President of Landry's Management, L.P., and Plaintiff's immediate supervisor, presented Plaintiff with an annual performance evaluation. (Hinds Decl. ¶ 9.)[2] The evaluation noted problems with the restaurant's food sanitation, poor Secret Shopper scores, and numerous guest complaints. (Id., Ex. B.) It also stated that Plaintiff needed to improve his organizational skills to prevent recurring issues, and to work on communicating with others with tact and professionalism. (Id.)

Beginning in November of 2008, the Chart House underwent a $750,000 renovation to improve the structure and appearance of the restaurant. (Id. ¶ 11.) Despite these improvements,

---

[2] Landry's Management, L.P. ("Landry's Management") is a subsidiary of Landry's, and oversees different entities under the Landry's umbrella. (Pl.'s Resp. Opp'n, Ex. B, Dep. of Mark Hinds, 10:12-21, Nov. 4, 2010 ("Hinds Dep."). Defendant CHLN, Inc., also a subsidiary of Landry's, was Plaintiff's employer at the time of his termination. (Id. at 10:12-11:12.)

2

routine inspections by management personnel in the months following the renovation revealed significant sanitation and maintenance issues. (Id.) Plaintiff acknowledges Chart House's on-going sanitation issues, but avers that these problems began long before he joined the staff. (Cohen Dep. 36:14-20.)

In January of 2009, executives from Defendant CHLN visited the Chart House, including Howard Cole, Senior Vice-President and Chief Operating Officer of Landry's Restaurant Group. (Decl. of Howard Cole ¶ 4, Mar. 11, 2011 ("Cole Decl.").) These executives were "extremely upset at the condition of the restaurant, finding it to be dirty, dusty, and unkempt." (Hinds Decl. ¶ 12.) Cole advised Hinds that if the restaurant did not improve, someone would be fired. (Cole Decl. ¶ 4; Hinds Decl. ¶ 12, Ex. D.) Hinds asserts that he told Plaintiff of this conversation. (Hinds Decl. ¶ 12.)

Hinds visited the Chart House on April 29, 2009, during which he "observed numerous cleanliness issues, including dusty surfaces throughout the restaurant, dirty carpets, kitchen floors and air vents, mold on walls, improperly stored food, debris under equipment, and a failure to ensure that employees were properly trained." (Id. ¶ 13, Ex. E.) That same day, the company posted a job opening for a new general manager for the Chart House. (Id. ¶ 14.)

In May 2009, the company's Human Resources Department received an anonymous call on the Employee Hotline stating that Plaintiff "did not help the staff, was unwilling to get involved in any issues pertaining to the restaurant, and talked down to the employees." (Hinds Decl. ¶ 17.) The caller also complained that the restaurant's environment was unprofessional and that Plaintiff had made inappropriate comments. (Id.) As a result of this call, Hinds held an employee meeting on May 27, 2009 to determine how the staff felt about their work

environment. (Id. ¶ 18.) During the meeting, the staff informed Hinds of "several ongoing equipment and facilities issues, as well as concerns regarding a lack of professionalism among the staff, and their perception that management was not addressing inappropriate behaviors." (Id.) "Specifically, employees advised [Hinds] that one of the managers had required employees to pay for a shortage, which is against company policy." (Id. ¶ 19.) Hinds determined that Plaintiff "knew of the incident but failed to take corrective or disciplinary action." (Id.) After investigating these concerns, Hinds issued another Disciplinary Action Report to Plaintiff for failure to uphold and adhere to company policy, and additional Reports to Plaintiff and the rest of his management team for "allowing an unprofessional atmosphere to exist." (Id., Ex G.)

On June 11, 2009, Hinds gave Plaintiff his annual performance review, which had decreased by two percent since the previous year. (Id. ¶ 20, Ex. H.) The review stated that Plaintiff needed improvement in the following categories: Job Knowledge, Development, Quality of Work, Cooperation, and Work Habits. (Id.) Hinds specifically noted that Plaintiff needed to "develop and maintain a professional work environment, improve on food sanitation and security procedures, and discipline employees consistently." (Id.)

Subsequent inspections in July 2009 revealed continued cleanliness and maintenance issues. (Id. ¶ 15, Ex. F.) According to Hines, the company "continued to receive numerous guests complaints about poor service and the cleanliness of the restaurant." (Id. ¶ 15.) When Hines attempted to counsel Plaintiff about the condition of the restaurant, Plaintiff attributed – and continues to attribute – these conditions to improper actions by the staff. (Id. ¶ 16; Pl.'s Resp. Opp'n 4.)

Another inspection of the Chart House on August 26, 2009 revealed continuing issues

with cleanliness and maintenance. (Id. ¶ 21, Ex. I; Cole Decl. ¶ 5.) In response to yet another failed inspection, upper-level executives exchanged several emails the following day discussing the need to fire Plaintiff. (Hinds Decl. ¶ 22, Ex. J; Cole Decl. ¶ 6, Ex. A.) In an email sent at 6:41 a.m. on Thursday, August 27, Jeff Cantwell, an employee in Development, stated, "Guys, I don't know what we need to do here but it is painfully obvious that this management team will not keep this store clean which excelerates (sic) deterioration and the need for capital repairs. Please advise." (Cole Decl., Ex. A.) At 9:41 a.m., Cole – whose approval was required to terminate Plaintiff – responded, "I told them to Fire him." (Id.) At 10:34 a.m. that day, Hinds sent an email to Charles Mayer, stating, "I have to fire [Plaintiff] 911, he is a 12 year GM but I have given him all the direction and systems in the world, he just doesn't care. I will call you today, I need to make this happen today if possible, think about it, I will call you." (Hinds Decl. Ex J.) At some point thereafter, Hinds contacted Jeff Laver, General Manager of the Crab House in Edgewater, New Jersey. (Hinds Dep. 334:4-24; Pl.'s Resp. Opp'n, Ex. F, Dep. of Jeffrey Laver, 47:17-49:1, Jan. 26, 2011 ("Laver Dep.").) During this call, Hinds instructed Laver to report to the Chart House on Saturday, August 29, for Plaintiff's termination and to serve as Interim General Manager. (Id.) A factual dispute exists as to when Hinds contacted Laver.

At 5:24 p.m. the following evening, Friday, August 28, Hinds received an email from Plaintiff stating that he had an appointment with a surgeon that Monday to discuss the possibility of surgery for his "sciatica/ruptured disk (sic) issues." (Hinds Decl., Ex K.) He stated, "My back is now worse than ever, I can barely get up and down the stairs. I may need to get the disc surgury (sic) done, which would put me out of action for a few weeks, we can discuss the best time for this to happen, I may be able to hold off for up to a month if needed, I will have more

information on Monday afternoon." (Id.)  Plaintiff had been suffering from back problems since the end of April or beginning of May.  (Cohen Dep. 124:19-21.)  At the time Plaintiff sent this email, he had received two epidural steroid injections to help alleviate his pain, on June 19 and July 2, 2009, but these injections only provided temporary relief.  (Id. at 124:19-125:7; Pl.'s Resp. Opp'n, Ex. D.)

Hinds terminated Plaintiff the following day.  (Hinds Decl. ¶ 26.)  During the termination, Hinds "informed [Plaintiff] that he was being discharged for poor leadership, which included his inability to maintain a clean restaurant, inability to achieve consistent Secret Shopper Report scores, excessive guest complaints, reoccurring poor procedures, and failure to correct issues noted in inspections." (Id.)  Plaintiff responded that he was "good at taking a store from shitty to 80 percent, but that [he was] not good at the details." (Cohen Dep. 122:24-123:4.)  Plaintiff concedes that nothing was said to lead him to believe that his termination was based upon anything other than his poor performance.  (Id. at 149:19-150:4.)  He contends, however, that the temporal proximity of his firing and the email he sent Hinds regarding his back issues suggests that he was terminated on the basis of his back condition.  (Id. at 139:6-11.)

Plaintiff commenced this action on February 4, 2010.  He filed an Amended Complaint on September 24, 2010, alleging discrimination and retaliation on the basis of his disability in violation of the Family Medical Leave Act, 29 U.S.C. § 2601 et seq. ("FMLA"), the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA"), and the Pennsylvania Human Relations Act, 43 Pa. C.S.A. § 951 et seq. ("PHRA").  Defendants filed a Motion for Summary Judgment on March 15, 2011, and Plaintiff filed a Response in Opposition on April 8, 2011.  Defendants filed a Reply on April 21, 2011.  The Court now considers Defendants' Motion.

## II.  STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2).  A factual dispute is "material" only if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party. Id.

On summary judgment, the moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004).  It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)).  Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).  If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255.

Although the moving party bears the initial burden of showing an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  It can meet

7

its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims." Id. at 325. Once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec., 475 U.S. at 586. "[T]he non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Moreover, the mere existence of some evidence in support of the nonmovant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the nonmovant on that issue. Anderson, 477 U.S. at 249-50.

### III. DISCUSSION

#### A. FMLA Interference Claim (Count I)

The Family and Medical Leave Act ("FMLA") entitles eligible employees to take up to twelve weeks of unpaid leave for a serious health condition. 29 U.S.C. § 2612(a)(1). The statute contains two distinct types of provisions: a series of prescriptive rights, also known as "entitlement" or "interference" provisions, 29 U.S.C. §§ 2612, 2614(a)(1), and "protection against discrimination based on the exercise of these rights, often referred to as the 'discrimination' or 'retaliation' provisions, 29 U.S.C. § 2615(a)(1-2); 29 C.F.R. § 825.220(c)." Detwiler v. Clark Metal Prods. Co., No. CIV.A.08-1099, 2010 WL 1491325, at *15 (W.D. Pa. Mar. 19, 2010) (citing Callison v. City of Philadelphia, 430 F.3d 117, 119 (3d Cir. 2005)).

Plaintiff asserts claims for both interference (Count I) and retaliation (Count IV).

Plaintiff's interference claim alleges that Defendants denied him his FMLA rights by terminating him within twenty-four hours of his request for leave on account of his back condition. Plaintiff further avers that Defendants failed to provide him with notice of the expectations and obligations associated with his exercise of FMLA rights. Defendants move for summary judgment on the basis that Plaintiff was terminated for performance issues, not because he requested leave.

"In order to assert a claim of interference, an employee must show that he was entitled to benefits under the FMLA and that his employer illegitimately prevented him from obtaining those benefits." Sarnowski v. Air Brooke Limousine, Inc., 510 F.3d 398, 401 (3d Cir. 2007) (citing Callison, 430 F.3d at 119). "As the Third Circuit has explained, '[a]n interference action is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA.'" Atchison v. Sears, 666 F. Supp. 2d 477, 488 (E.D. Pa. 2009) (citing Callison, 430 F.3d at 120). "Because the FMLA is not about discrimination, a McDonnell Douglas burden-shifting analysis is not required." Naber v. Dover Healthcare Assocs., Inc., 765 F. Supp. 2d 622, 647 (D. Del. 2011). Thus, "the employer cannot justify its actions by establishing a legitimate business purpose for its decision." Callison, 430 F.3d at 119-20.

Here, Plaintiff offers evidence that he requested leave to undergo surgery and was terminated the following day. Defendants' sole challenge to Plaintiff's claim is that he was terminated for a legitimate, non-discriminatory reason. (Defs.' Mot. Summ. J. 18-19.) Such a defense does not apply to FMLA interference claims. Defendants do not contest that Plaintiff's

email constituted a request for FMLA leave, nor do they argue that Plaintiff was not entitled to request leave for back surgery. In light of Defendants' failure to raise an appropriate defense to Plaintiff's interference claim, the Court denies summary judgment as to this count.

### B. ADA and PHRA Discrimination Claims (Counts II and III)

The ADA prohibits employment discrimination against "a qualified individual on the basis of disability" with regard to "the hiring, advancement, or discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).[3] Plaintiff alleges that Defendants violated the ADA by terminating him upon receiving his request for leave to undergo back surgery.

When analyzing discrimination claims under the ADA, courts apply the burden-shifting framework announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Parker v. Verizon Pa., Inc., 309 Fed. Appx. 551, 555 (3d Cir. 2009). Under the McDonnell Douglas scheme:

> (1) plaintiff bears the burden of establishing a prima facie case of discrimination; (2) the burden of production then shifts to defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action; and (3) if defendant meets its burden of production, plaintiff must prove by a preponderance of the evidence that defendant's proffered reason was a pretext for discrimination.

Id. (citing McDonnell Douglas, 411 U.S. at 802.). To establish a *prima facie* case of discrimination under the ADA, the plaintiff must allege that: "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an

---

[3] The same legal standard applies to Plaintiff's claims under the ADA and the PHRA. Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996). Therefore, the Court's analysis of Plaintiff's ADA claims also applies to Plaintiff's PHRA claims.

otherwise adverse employment decision as a result of discrimination." Gaul v. Lucent Techs., 134 F.3d 576, 580 (3d Cir. 1998) (citing Shiring v. Runyon, 90 F.3d 827, 831 (3d Cir. 1996)). Defendants contend that Plaintiff cannot establish a *prima facie* case of discrimination because he was neither disabled nor regarded as such at the time of his termination. They further argue that, even if Plaintiff can meet the first prong of the McDonnell Douglas test, he cannot show that Defendants' proffered non-discriminatory reason for terminating him was pretextual.

### 1. Whether Plaintiff was Disabled

The ADA provides that an individual has a disability if he has: (1) "a physical or mental impairment that substantially limits one or more major life activities;" (2) "a record of such an impairment;" or (3) is "regarded as having such an impairment." 42 U.S.C. § 12102(1). "Major life activities" include, but are not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). To determine whether a plaintiff is "substantially limited" in performing a major life activity, courts consider: "(i) [t]he nature and severity of the impairment; (ii) [t]he duration or expected duration of the impairment; and (iii) [t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." Namako v. Acme Mkts., Inc., No. CIV.A.08-3255, 2010 WL 891144, at *4 (E.D. Pa. Mar. 11, 2010) (quoting Emory v. AstraZeneca Pharms. LP, 401 F.3d 174, 179-80 (3d Cir. 2005) (citing 29 C.F.R. § 1630.2(j)(2)). Defendants argue that Plaintiff is not disabled under the ADA because his back condition was only temporary and did not substantially limit a major life activity.

Whether an individual is substantially limited in a major life activity is a question of fact.

Carraway v. Borough of Wilkinsburg, No. CIV.A.9-372, 2009 WL 2981955, at *1 (W.D. Pa. Sept. 11, 2009) (citing Williams v. Philadelphia Hous. Auth. Police Dep't, 380 F.3d 751, 763 (3d Cir. 2004)). Before Congress amended the ADA in 2008, the Supreme Court construed the Act strictly, finding that an individual was "substantially limited" only if she had "an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 198 (2002). The Court, citing the EEOC's interpretation of the pre-amendment standard, further held that the impairment's impact must be "permanent or long term." Id. In another leading ADA case, the Court dictated that the degree of limitation caused by an individual's impairment should be determined with reference to the ameliorative effects of mitigating measures. Sutton v. United Airlines, Inc., 527 U.S. 471, 499 (1999).

With the passage of the ADA Amendments Act of 2008 ("ADAAA"), however, Congress explicitly rejected Toyota and Sutton and increased the statute's non-exhaustive list of "major life activities" in an effort to promote a less restrictive interpretation of "disability." Pub. L. No. 110-325, §§ 2(b)(1)-(6), 3(2)(a), 122 Stat. 3553, 3555 (2008). In doing so, Congress declared that "[t]he definition of disability shall be construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this Act." Pub. L. No. 110-325, § 3(a), 122 Stat. at 3555. To that end, the EEOC's interpretation of the amended ADA notes that "substantially limits" is "not meant to be a demanding standard." 29 C.F.R. § 1630.2(j)(1)(i) (2011). The Commission further opined that even "effects of an impairment lasting or expected to last fewer than six months can be substantially limiting within the meaning of this section." Id. § 1630.2(j)(1)(ix). Moreover, the EEOC found that "whether an activity is a 'major life

activity' is not determined by reference to whether it is of 'central importance to daily life.'" Id. § 1630.2(i)(2). Rather, "the determination of whether an impairment substantially limits a major life activity requires an individualized assessment," and should "require a degree of functional limitation that is lower than the standard for 'substantially limits' applied prior to the ADAAA." Id. § 1630.2(j)(1)(iv).

Under the less restrictive standards of the ADAAA, the Court finds that Plaintiff has offered sufficient evidence to raise a genuine issue of fact as to whether he was disabled at the time of his termination. Plaintiff testified in his deposition that he suffered from debilitating back and leg pain for nearly four months before his termination, which impacted his ability to walk, climb stairs, and sleep. (Cohen Dep. 124:19-125:7.) In addition to Plaintiff's own testimony, he has submitted a letter from his doctor dated June 17, 2009 – over two months before Plaintiff's termination – in which the doctor diagnosed him with lumbar radiculopathy with spinal and foraminal stenosis and recommended a series of back injections. (Pl.'s Resp. Opp'n, Ex. C.) The letter states: "[Plaintiff's] pain is aggravated by walking and lying down. He can only walk ten to twenty yards at a time and then he has to stop and rest. He gets some relief when he applies ice to his leg or when he sits. He finds it very difficult to sleep at night in that he is constantly tossing and turning in order to try and find a more comfortable position. He walks with the assistance of a cane." (Id.) After multiple injections failed to resolve his back and leg issues, his doctor recommended surgery requiring weeks of recovery. (Cohen Dep. 125:13-19; Pl.'s Resp. Opp'n, Ex. E.) Plaintiff continued to experience severe pain and limited mobility until he underwent surgery in December of 2009. (Cohen Dep. 142:8-11.). Plaintiff's deposition testimony indicates that he still struggles with these issues. (Id. at 148:20-23.)

Defendants argue that Plaintiff's condition was of too short a duration to qualify as a disability. (Defs.' Mot. Summ. J. 15). The Court disagrees. As discussed above, the ADAAA mandates no strict durational requirement for plaintiffs alleging an actual disability. Even if it did, Plaintiff's evidence could allow a jury to find that his condition was by no means fleeting. Plaintiff's back and leg issues began four months before his termination and were not resolved by the injections recommended by Plaintiff's doctor. At the time of the termination, Plaintiff's doctor had suggested the possibility of surgery requiring extensive recovery time, with no indication that Plaintiff's condition would be resolved permanently. Such a severe, ongoing impairment stands in distinct contrast to those cited by the EEOC as merely minor and temporary, such as the common cold or flu. 29 C.F.R. pt. 1630.2, app. § 1630.2(l).

Defendants also argue that "climbing stairs" is not a major life activity within the meaning of the ADA. (Defs.' Mot. Summ. J. 15 n.4.) The case Defendants offer in support of this proposition, however, cites to authority using the more restrictive pre-amendment ADA. See Lynch v. Matthews Int'l, No. CIV.A.08-1717, 2010 WL 2640597, at *3 n.4 (W.D. Pa. June 29, 2010). Moreover, even if the Court were to find that climbing stairs is not a major life activity, Plaintiff's inability to walk more than ten or twenty yards at a time easily passes muster under the more inclusive standards of the ADAAA. Accordingly, the Court finds that Plaintiff has submitted sufficient evidence from which a reasonable factfinder could determine that he had a disability within the meaning of the amended ADA.

### 2. Whether Plaintiff was "Regarded as" Disabled

Alternatively, Plaintiff argues that he qualifies for ADA coverage because Defendants

regarded him as disabled. Under the pre-amendment ADA, a plaintiff was "regarded as" disabled if the employer either "mistakenly believed that [the employee had] a physical impairment that substantially limits one or more major life activities" or "mistakenly believed that an actual non-limiting impairment substantially limits one or more major life activities." Wilson v. MVM, Inc., 475 F.3d 166, 179 (3d Cir. 2007) (quoting Sutton, 527 U.S. at 489); see also 29 C.F.R. § 1630.2(l)(1), (3) (2006) (defining "regarded as having such an impairment"). In contrast, the ADAAA states that an individual is "regarded as" disabled if he establishes that he "has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. 12102(3)(A). Notably, where a plaintiff is merely regarded as disabled rather than suffering from an actual disability, the perceived impairment must not be transitory or minor. Id. § 12102(3)(B).

  The Court agrees with Defendants that a plaintiff's potential inability to work for a short period of time in the future while recovering from surgery does not constitute a "disability" within the meaning of the ADA. (Defs.' Reply 4.) The Court has already determined, however, that a jury could conclude that Plaintiff's condition was by no means temporary. Further, Plaintiff offers significant evidence that he was perceived to have a severe, on-going impairment. For months before his termination, Plaintiff stated that he walked with a cane at work and was often seen limping slowly or doubled over with pain. (Cohen Dep. 127:3-4, 130:5-6, 10-16, 132:21-22.) He visibly struggled to move around the restaurant, particularly up and down the stairs. (Id. at 130:10-16.) He testified that he discussed his back ailment with Defendant Hinds on multiple occasions in the months leading to his termination, culminating in his email to Hinds

regarding the need for surgery the night before his termination. (Id. at 127:9-22, 133:22-25; Hinds Dep. 222:22-223:2.) Pursuant to the broadened standards of the ADAAA, the Court finds such evidence sufficient to allow a jury to conclude that Plaintiff was regarded as disabled.

### 3. Whether Defendants' Proffered Reason for Plaintiff's Termination was a Pretext for Discrimination

Defendants next argue that, even if Plaintiff has presented a *prima facie* case of discrimination under the ADA, he has not offered evidence raising a genuine factual dispute as to whether Defendants' proffered non-discriminatory reason for terminating him was pretextual. (Defs.' Mot. Summ. J. 17-18.) To defeat a motion for summary judgment where a defendant has offered a legitimate, non-discriminatory reason for an adverse employment action, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994). To do so, "the plaintiff cannot simply show that the employer's decision was wrong or mistaken." Id. at 765. "Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence . . . .'" Id. (quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992)).

Here, Defendants have carried their burden in producing a legitimate, non-discriminatory reason for their termination of Plaintiff. They offer extensive evidence of Plaintiff's poor performance record, in addition to email discussions by upper-level executives of the need to fire

Plaintiff from just two days before his actual termination. (Defs.' Mot. Summ. J. 3-6.) As Plaintiff argues, however, notably absent from the record is any documentation of a final decision on this matter or any further communication regarding the approval, timing, or logistics of Plaintiff's termination. Defendant Hinds did not fire Plaintiff on August 27, the day he sent an email calling for Plaintiff's termination; nor did he do so the next day. In fact, Defendants had been seeking a replacement manager for four months, with no apparent urgency. (Hinds Dep. 284:8-23.) Yet after months of discussions concerning Plaintiff's performance with no official action taken, Plaintiff offers evidence that Defendant Hinds contacted Jeff Laver with instructions to replace Plaintiff within hours of Hinds's receipt of Plaintiff's email requesting medical leave. (Laver Dep. 47:17-49:1.) Immediately upon receipt of the email on the evening of August 28, Defendant Hinds also contacted Howard Cole and Landry's legal counsel, and Plaintiff's termination occurred the next morning. (Hinds Dep. 131:10-11, 139:23-140:3.)

Drawing all reasonable inferences in favor of Plaintiff, such evidence could allow a jury to conclude that, rather than risk the possibility of having to provide Plaintiff with medical leave or other accommodations while planning for his eventual replacement, Defendants fired Plaintiff immediately. Thus, a genuine factual dispute remains as to the motivation behind the decision to fire Plaintiff on Saturday, August 29. For these reasons, the Court finds summary judgment inappropriate at this juncture.

    **C.**    **ADA, PHRA, and FMLA Retaliation Claims (Counts IV and V)**

The ADA, PHRA, and FMLA also "prohibit an employer from retaliating against an employee because the employee exercised her rights under the statutes or opposed any practice made unlawful by them." <u>Reifer v. Colonial Intermediate Unit</u>, 462 F. Supp. 2d 621, 638-39

17

(M.D. Pa. 2006) (citations and quotations omitted). Such claims are analyzed under the McDonnell Douglas test, as described above. To establish a *prima facie* case of retaliation in violation of the ADA or FMLA, the plaintiff "must show that she engaged in an activity protected under any of the statutes; she suffered an adverse employment decision; and, the adverse decision was causally related to the exercise of her ADA or FMLA rights." Id. at 639.

  Defendants argue that Plaintiff cannot establish a causal relation between the exercise of his statutory rights and his termination. To the contrary, the Court finds that the extreme temporal proximity of Plaintiff's request for leave and his termination – particularly the alleged call to Laver to replace Plaintiff within hours of Plaintiff's email – is sufficient to support a *prima facie* case of retaliation. See, e.g., Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989) (finding plaintiff had established causation for the purposes of his *prima facie* case by showing that his discharge occurred only two days after his employer had received notice of plaintiff's EEOC claim); Reinhart v. Mineral Techs. Inc., No. CIV.A.05-4203, 2006 WL 4050695, at *11 (E.D. Pa. Nov. 27, 2006) (finding termination unduly suggestive when it occurred twenty-four hours after FMLA leave ended).

  Alternatively, Defendants again argue that, even if Plaintiff can establish a *prima facie* case of retaliation, he cannot prove that Defendants' proffered non-discriminatory reason for terminating him was pretextual. (Defs.' Mot. Summ. J. 17-19.) The Court has already concluded, in the context of Plaintiff's ADA discrimination claim, that Plaintiff has raised a genuine factual dispute as to whether his request for leave played a determinative role in his firing. Moreover, the two cases Defendants offer in support of their argument are inapposite. In Reifer, supra, the court found that the plaintiff, who alleged that the defendant violated the ADA

by firing her in retaliation for an EEOC complaint for disability discrimination, could not show that the defendant's non-discriminatory reason for her termination was pretextual. 462 F. Supp. 2d at 639. In that case, however, the plaintiff had been officially terminated before she filed the EEOC complaint. Id. Although the plaintiff sent a letter to her employer before the filing of the complaint stating that she would vindicate her rights in federal court, she did so after receiving notification of both her termination hearing and the charges upon which the company would make its decision. Id. The court was able to confirm that the company based its decision entirely on those charges via the hearing officer's report. Id. Similarly, in Conoshenti v. Pub. Serv. Elec. & Gas Co., supra, the plaintiff was subject to automatic discharge under the terms of a "Last Chance Agreement" he had entered with his employer. 364 F.3d at 148. There, the court noted that the defendant had been careful to respect the plaintiff's FMLA rights while still terminating him "as soon as it could legally do so" after his violation of the Agreement. Id.

In the instant case, there was no such automatic trigger to discharge. Rather, company executives had discussed the need for Plaintiff's termination, but had taken no such action in the four months since the initial discussion began. Plaintiff had not yet been terminated at the time he engaged in statutorily-protected activity, nor had he been notified of any pending termination. As such, the Court finds a material fact dispute remains as to the motive behind Plaintiff's termination, and thus declines to grant summary judgment as to Plaintiff's claims for retaliation under the ADA, PHRA, and FMLA.

IV. **CONCLUSION**

In light of the foregoing, the Court denies Defendants' Motion for Summary Judgment in its entirety. Defendants have undoubtedly presented a wealth of evidence justifying their

termination of Plaintiff. Nonetheless, their failure to fire Plaintiff, after years of poor performance reviews, until the morning after he requested leave for his back condition raises a sufficient question as to Defendants' alleged discriminatory motive to render summary judgment inappropriate.

      An appropriate Order follows.